NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| HARTFORD CASUALTY INSURANCE, an Indiana Corporation, | Civil Action No.: 18-cv-0044 |
| Plaintiff, | |
| v. | **OPINION** |
| LIBERTY MUTUAL FIRE INSURANCE COMPANY, a Wisconsin Corporation, | |
| Defendant. | |

**CECCHI, District Judge.**

## I.      INTRODUCTION

This matter comes before the Court on Plaintiff Hartford Casualty Insurance's ("Plaintiff" or "Hartford") and Defendant Liberty Mutual Insurance Company's ("Defendant" or "Liberty Mutual") cross-motions for summary judgment as to Plaintiff's claims.  ECF Nos. 29, 30.  The parties opposed the cross-motions for summary judgment (ECF Nos. 31, 32), and replied in support of their motions (ECF Nos. 33, 34).  The Court has considered the submissions made in support of and in opposition to the motions and decides the motions without oral argument pursuant to Fed. R. Civ. P. 78(b).  For the reasons set forth below, the cross-motions for summary judgment are denied.

## II.     BACKGROUND

This case stems from a dispute between two insurance carriers regarding a trial verdict in a tort lawsuit in the New Jersey Superior Court, Law Division, Middlesex County (the "Tort Action"). Specifically, Plaintiff, the excess insurance carrier for WB Mason Company, Inc. ("WB Mason"), alleges that Defendant, the primary insurance carrier for WB Mason, failed to negotiate in "good faith" with Rosemarie Williams (the "Claimant") in the underlying Tort Action and settle

within Defendant's primary policy limit prior to trial (the "Negotiation Period") in violation of New Jersey law, which ultimately resulted in a trial verdict for Claimant in excess of Defendant's primary policy limit and thus exposed Plaintiff to excess payment.  ECF No. 1 (the "Compl.").

Defendant issued a commercial auto liability policy to WB Mason for the period between September 30, 2010 to September 30, 2011, with a primary policy limit of $1,000,000 per accident. ECF No. 29-2 at ¶ 1.  Plaintiff issued an "[u]mbrella," excess, policy to WB Mason for the same period.  *Id.* at ¶ 2.  Plaintiff's excess liability limit was $3,000,000 per accident and attached to pay losses in excess of the limits of Defendant's underlying primary liability policy.  *Id.*

On December 15, 2010, a truck driven by a WB Mason employee (the "Driver") ran a red light and struck an automobile driven by Claimant.  ECF No. 30-1 at ¶ 3.  WB Mason later reported Claimant's claim against the Driver to Defendant.  *Id.* at ¶ 4.  Two months later, on February 24, 2011, Claimant's attorney informed Defendant that Claimant's injuries were "mainly left knee, left shoulder, and back."  *Id.*  That same day, Defendant internally concluded that the Driver "[a]ppears to be 100%" at fault in terms of liability regarding the accident.  ECF No. 29-2 at ¶ 6.

Over the course of the following 20 months, while the parties to the Tort Action received rolling updates from Claimant regarding her injuries, Defendant investigated Claimant's claim and discussed settling the case with Claimant's attorney.  ECF No. 30-1 at ¶¶ 4–18.  However, during this same period, Defendant and Claimant had difficulty reaching a settlement because Claimant's changing medical condition continued to affect the parties' valuation of damages.  *Id.*

Then, on November 1, 2012, Claimant brought the Tort Action against Defendant in New Jersey state court.  *Id.* at ¶ 19.  Defendant subsequently assigned the case to counsel Michael Palma. ECF No. 29-2 at ¶ 9.  Over the course of the following three years, Defendant's counsel and Claimant's counsel conducted discovery, including interrogatories and depositions, and settlement

discussions, which continued to evolve based on Claimant's changing medical condition. *Id.* at ¶¶ 10–53; ECF No. 30-1 at ¶¶ 19–42. Moreover, during this same period, Defendant internally assessed the "full" value of Claimant's claim between $525,000 and $981,000. ECF No. 29-2 at ¶¶ 29, 33, 46. Additionally, Defendant's counsel estimated general damages at trial could range between $400,000 and $1,500,000, with a "likely" outcome of $800,000. *Id.* at ¶ 35. Consequently, Defendant set its loss reserves at over $575,000, "with the understanding that [they were] seeking additional medical records concerning claimant's past medical condition[s]." ECF No. 30-1 at ¶ 27. However, Defendant now maintains that "[n]o one [internally] valued the case . . . for *settlement* . . . above $500,000" during this period. ECF No. 31 at 4 (emphasis added).

   **a.  The Mediation and Trial**

   On December 3, 2015, Defendant and Claimant agreed to mediate their dispute (the "Mediation"), with the Mediation scheduled for December 10, 2015 before retired Judge John Keefe, Sr. ECF No. 30-1 at ¶ 35. While Defendant's claim adjuster requested $500,000 settlement authority for the Mediation, Defendant ultimately afforded $375,000 in settlement authority for the Mediation, *Id.* at ¶¶ 35, 37, "subject to change with a phone call [at the Mediation] as warranted." ECF No. 31 at 11. At the start of the Mediation, Claimant opened with a $1,000,000 settlement offer. ECF No. 29-2 at ¶ 50. Defendant countered with a $250,000 settlement offer, which Claimant rejected and countered with a $750,000 settlement offer. *Id.* at ¶ 51. The case did not settle at the Mediation as Claimant "walked out . . . as she was not willing to drop below" the $750,000 figure. ECF No. 30-1 at ¶ 40. After Claimant left the Mediation, the mediator disclosed that he valued the case at around $500,000, and Claimant's counsel disclosed that they (but not Claimant) valued the case between $600,000 and $650,000. *Id.* at ¶ 41.

On December 14, 2015, in response to a message by Plaintiff, Defendant wrote to Plaintiff noting that it understood Plaintiff's "directive" to settle the case within its primary policy limit, but that Defendant nevertheless does "not pay cases at [its] limits to satisfy an excess carrier when the factual merits of the case do not support a pay out at the [then] current demand of $750,000." *Id.* at ¶ 42.

Thereafter, on January 20, 2016, Defendant's counsel offered Claimant $350,00 to settle the Tort Action, which Claimant declined.  *Id.* at ¶ 46.  Months later, on April 15, 2016, Defendant's counsel offered Claimant $600,000 to settle the Tort Action, which Claimant also rejected. *Id.* at ¶ 48.

Finally, on May 2, 2016, trial in the Tort Action commenced before Judge Joseph Rea in New Jersey Superior Court.  *Id.* at ¶ 49.  On the first day of trial, Judge Rea spent time trying to "convince" Claimant to accept Defendant's $600,000 settlement offer, which Claimant's attorney, but not Claimant, categorized as "fair."  *Id.*  However, Claimant continued to refuse this settlement offer, as well as a "high/low offer" of $920,000/$400,000, with the "high" being based on the remaining limit of Defendant's primary policy.[1]  *Id.*  Ultimately, the trial proceeded to a jury verdict, and the jury awarded Claimant $1,400,000, including $150,000 for lost wages, $350,000 for pain and suffering, and $900,000 for future medical costs.  ECF No. 29-2 at ¶ 56.  Following the verdict, Defendant tendered its remaining policy limit, and Plaintiff tendered the excess amount.  *Id.* at ¶ 57.  In total, Plaintiff has made $631,725.13 in excess payments (the "Excess Payments") on this claim.  *Id.*

---

[1] "High/low" agreements cap damages—both on the low and high end—that a plaintiff may receive on a trial verdict.

### b. The Instant Action

Over one year later, on January 11, 2018, Plaintiff brought this action against Defendant seeking damages totaling the Excess Payments. *See generally* Compl. In Count I, Plaintiff alleges that Defendant is liable to Plaintiff for the Excess Payments because it breached its duty to "negotiate in good faith and settle" the Tort Action within its policy limit. *Id.* at ¶ 32. In Count II, Plaintiff alternatively alleges that it is "equitably subrogated" to the rights of WB Mason with respect to the Excess Payments.[2] *Id.* at ¶ 45.

## III.   <u>LEGAL STANDARD</u>

A court shall grant summary judgment under Rule 56(c) "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *New Milford Bd. of Educ. v. C.R.*, No. 09-328, 2010 WL 2571343, at *2 (D.N.J. June 22, 2010), *aff'd*, 431 F. App'x 157 (3d Cir. 2011). Furthermore, "[i]f the court does not grant all the relief requested by the motion, it may enter an order stating any material fact – including an item of damages or other relief – that is not genuinely in dispute and treating the fact as established in the case." *Adams v. Klein*, No. 18-1330, 2020 WL 2404772, at *4 (D. Del. May 12, 2020) (citing Rule 56(g)). The "substantive law identifies which facts are material, and 'only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Beard v. Norfolk S. Ry. Corp.*, No. 18-1801, 2020 WL 2616670, at *2 (M.D. Pa. Mar. 12, 2020), *report and recommendation adopted*, 2020 WL 2615728 (M.D. Pa. May 22, 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, a dispute about a

---

[2] Plaintiff notes that if the Court grants its "motion for summary judgment as to Count I of the Complaint, then Count II of the Complaint (equitable subrogation) will be moot, because it seeks the same relief as Count I." ECF No. 29-1 at 1.

material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.*

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has satisfied this burden, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Importantly, summary judgment is also appropriate "if the non-moving party provides merely conclusory or speculative evidence." *Beard*, 2020 WL 2616670, at *2 ("There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts."). Indeed, "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." *Thimons v. PNC Bank, NA*, 254 F. App'x 896, 899 (3d Cir. 2007); *see also Beard*, 2020 WL 2616670, at *3 ("[O]nly evidence which is admissible at trial may be considered in ruling on a motion for summary judgment."). Finally, the Court must view the evidence presented in the light most favorable to the non-moving party when deciding a motion pursuant to Rule 56. *Id.*

"The standard by which the court decides a summary judgment motion does not change when the parties file cross-motions." *Clevenger v. First Option Health Plan of N.J.*, 208 F. Supp. 2d 463, 468 (D.N.J. 2002). "When ruling on cross-motions for summary judgment, the court must consider the motions independently . . . and view the evidence on each motion in the light most

favorable to the party opposing the motion." *Id.* at 468–69 (citations omitted). "That one of the cross-motions is denied does not imply that the other must be granted." *Ill. Nat'l Ins. v. Wyndham Worldwide Operations, Inc.*, 85 F. Supp. 3d 785, 794 (D.N.J. 2015).

## IV.   <u>DISCUSSION</u>

Plaintiff argues that it is entitled to summary judgment because there is no dispute that Defendant failed to negotiate in "good faith" with Claimant during the Negotiation Period, as required under New Jersey law. *See generally* ECF No. 29-1. Alternatively, Defendant argues that it is entitled to summary judgment as there is no dispute that it conducted settlement negotiations with Claimant in "good faith" at all times during the Negotiation Period. *See generally* ECF No. 30-2. Viewing the record in the light most favorable to both parties on the cross motions, for the reasons described below, the Court finds that existing genuine disputes of material fact preclude entry of summary judgment.

### a.   *Rova Farms* Liability

Under the seminal case of *Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 N.J. 474 (1974), a primary insurer is liable to an excess insurer for an excess verdict where the primary insurer failed to settle with a third-party claimant within the primary policy limit prior to trial, and where, prior to trial, (1) a jury could have potentially found liability for the third-party claimant and the potential verdict could have exceeded the primary policy limit, (2) the third-party claimant was willing to settle within the primary policy limit, and (3) the primary insurer did not negotiate in "good faith." *Am. Hardware Mut. Ins. Co. v. Harley Davidson of Trenton, Inc.*, 124 F. App'x 107, 112 (3d Cir. 2005) (citing *Rova Farms*, 65 N.J. at 490–91); *see also New Jersey Mfrs. Ins. Co. v. Nat'l Cas. Co.*, 393 N.J. Super. 340, 923 A.2d 315 (App. Div. 2007) (applying *Rova Farms* in context of primary insurer liability to excess insurer regarding an excess verdict).

Here, it is undisputed that the first two *Rova Farms* prongs are met, as the jury in the Tort Action awarded Claimant damages in excess of Defendant's primary policy limit and Claimant would have settled for $750,000, a figure within the primary policy limit.  Thus, the only open question is whether Defendant negotiated in "good faith" with Claimant during the Negotiation Period.

As alluded to above, *Rova Farms*' third prong provides that a primary insurer "has a positive fiduciary duty" to act in "good faith," *i.e.*, "to take the initiative and attempt to negotiate a settlement within the [primary] policy coverage."  *Re Brightview Enter. Sols., LLC v. Farm Family Cas. Ins. Co.*, No. 20-7915, 2020 WL 6074474, at *2 (D.N.J. Oct. 15, 2020) (citations omitted).  Thus, a primary insurer's "negotiation strategy" with the third-party claimant must have a "reasonable prospect for a successful outcome" for both itself and the excess insurer, *Nat'l Cas. Co.*, 393 N.J. Super. at 344, such that the strategy is not infected with "dishonest[y]" or "negligence." *Wood v. New Jersey Mfrs. Ins. Co.*, No. 1768-082, 2010 WL 2990960, at *11 (N.J. Super. Ct. App. Div. July 28, 2010), *aff'd as modified*, 206 N.J. 562 (2011) (quoting *Rova Farms*, 65 N.J. at 497).  Moreover, consideration of "*all the factors* bearing upon the advisability of a settlement," including the primary insurer's "experience, expertise and judgment," is required to assess this "good faith" inquiry.  *Id.* (citations omitted) (emphasis in original).  Finally, evaluating whether a primary insurer negotiated in "good faith" must not be done in "[h]indsight," *e.g.*, a "mere failure to settle within the [primary] policy limit when there was an opportunity to do so before or during trial is not a *per se* demonstration of bad faith."  *Id.* at *12 (citations omitted).

### b.  Genuine Disputes of Material Facts Preclude Entry of Summary Judgment

As described below, genuine disputes of material fact exist about whether Defendant negotiated in "good faith" with Claimant at the Mediation, where it failed to settle the Tort Action within its primary policy limit.

First, the parties dispute the amount which Defendant placed as a "settlement value" on Claimant's claim at the time of the Mediation, and whether this "settlement value" was reasonably calculated considering Claimant's available medical records.  *Compare* ECF No. 29-1 at 16 *with* ECF No. 31 at 11.  These disputed facts are critical to assessing whether Defendant's limited extension of settlement authority to its agents, and subsequent settlement offer to Claimant at the Mediation, were made in "good faith."  *State Nat. Ins. Co. v. Cty. of Camden*, 10 F. Supp. 3d 568, 586 (D.N.J. 2014) (denying insurer's motion for summary judgment under *Rova Farms* where the insurer failed to extend a settlement authority to its agents, or offer a settlement to the claimant, on par with its internal "settlement value" of the case).

In particular, Plaintiff alleges that Defendant placed an internal "settlement value" on Claimant's claim of well over $500,000 at the time of the Mediation, as (1) Defendant's claim adjusters had concluded that the "full" value of Claimant's claim "was somewhere between $523,000 and $981,000," (2) Defendant set its reserves at over $575,000, and (3) Defendant's counsel in the Tort Action concluded that the "probable" verdict at trial was $800,000, and that total damages could reach $2,000,000.  ECF No. 29-1 at 15.  In contrast, Defendant asserts that it internally placed a "settlement value" on Claimant's claim of only $500,000 at the time of the Mediation.  ECF No. 31 at 11.  Moreover, Defendant avers that Plaintiff's "reference to Liberty Mutual's estimation of the 'full value' [of Claimant's claim], as well as reserves established by Liberty Mutual, are figures that have little bearing on Liberty Mutual's actual analysis of the

settlement value of the claim." *Id.* at 10–11.  Ultimately, according to Defendant, the "full value" calculation omits "consideration of any discount of liability or medical causation issues . . . [f]ull value is [therefore] not settlement value." *Id.* (citing Affirmation of William P. Krauss, Exhibit 15 at 17:8-18:8, 71: 17-21).  For the same reasons, Defendant contends that its counsel's suggested "verdict estimation" was also "not a settlement value."  ECF No. 30-2 at 37.

Additionally, and irrespective of how Defendant calculated its "settlement value" as to Claimant's claim, the parties dispute whether Defendant's "hardball" negotiation strategy at the Mediation was conducted in "good faith."  *Nat'l Cas. Co.*, 393 N.J. Super. 340, 354, 923 A.2d 315, 324 (App. Div. 2007) (factual issues precluded summary judgment where it was unclear whether a "hardball settlement strategy" amounted to a violation of an insurer's duty to negotiate in "good faith") (citations omitted).  Specifically, Plaintiff argues that it was in the "antitheses of a good faith approach to settlement" for Defendant to extend only $375,000 in settlement authority for, and offer only $250,000 to Claimant at, the Mediation when, as noted above, Defendant's internal "full," "verdict," and "reserve" values as to Claimant's claim were substantially higher at that time.  ECF No. 29-1 at 16.  On the other hand, Defendant asserts that "further negotiation was anticipated" after Defendant made its initial $250,000 settlement offer to Claimant at the Mediation and that "Liberty Mutual's adjuster was prepared to request settlement authority above Liberty Mutual's [then] current $375,000 authority."  ECF No. 31 at 9.

Both parties have produced compelling evidence regarding whether Defendant engaged, or failed to engage, in "good faith" settlement negotiations at the Mediation.  Therefore, entry of summary judgment is inappropriate based on the record presently before the Court.  Indeed, assessments of these issues "will hinge . . . upon the credibility and persuasiveness of fact . . . and expert . . . witnesses and evidence presented at trial."  *Wood*, 2010 WL 2990960, at *14 (finding

that "genuine fact-sensitive determinations" precluded entry of summary judgment under *Rova Farms*). For example, the question of whether "Liberty Mutual's adjuster was prepared to request settlement authority above Liberty Mutual's $375,000 authority" at the Mediation (ECF No. 31 at 9) is one that inherently calls for credibility determinations. *Wood*, 2010 WL 2990960, at *14. Moreover, the question of whether Defendant's "hardball" negotiation strategy at the Mediation was executed in "good faith" demands further consideration of the factual record by the trier of fact as to Defendant's "expertise" and "judgment." *Id.*

Finally, the Court disagrees with the parties insofar as they attempt to demonstrate in "[h]indsight" that Defendant negotiated or failed to negotiate in "good faith" at the Mediation. *Id.* at *14; *see also U.S. Fire Ins. Co. v. Royal Ins. Co.*, 759 F.2d 306, 311, n.6 (3d Cir. 1985) (noting that evidence of a trial verdict is "far from being the utmost evidence of bad faith" with respect to previous settlement negotiations even "with the benefit of hindsight") (citations omitted). For instance, Plaintiff argues that the trial verdict of over $1,000,000 awarded to Claimant demonstrates that Defendant's limited extension of settlement authority and subsequent settlement offer at the Mediation were unreasonably low and thus made in "bad faith." ECF No. 29-1 at 18–19. Alternatively, Defendant argues that, irrespective of whether its settlement offer to Claimant was too low, it did not negotiate in "bad faith" at the Mediation because it was not reasonable at that time to settle with Claimant for $750,000, a figure which Defendant later learned Claimant would not have "move[d] below" (ECF Nos. 29-2 at ¶ 53, 30-1 at ¶ 45). ECF No. 30-2 at 30. Nevertheless, "the perfect vision of hindsight is not the lens through which our courts assess compliance with good-faith obligations." *Palmer v. New Jersey Manufacturers Ins. Co.*, No. 0854-153, 2017 WL 6398789, at *4 (N.J. Super. Ct. App. Div. Dec. 14, 2017) (citations omitted); *see also Wood*, 2010 WL 2990960, at *11 (the fact that a primary insurer's policy limit was exceeded

11

by the trial verdict after the primary insurer failed to settle the case was not indicative of "bad faith" even in "[h]indsight"). Rather, whether Defendant negotiated in "good faith" at the Mediation depends only on the facts known to it at that time. *Id.*

Accordingly, the Court denies both parties' motions for summary judgment.[3] *See Wood*, 2010 WL 2990960, at *14 ("Prudence dictates that . . . pivotal questions of reasonableness and bad faith be decided . . . after a full-blown evidentiary presentation before the factfinder.").

## V.   **CONCLUSION**

For the reasons set forth above, Plaintiff's and Defendant's cross motions for summary judgment (ECF Nos. 29, 30) are **DENIED**. An appropriate Order accompanies this Opinion.

**DATED**: March 29, 2021

_____
**CLAIRE C. CECCHI, U.S.D.J.**

---

[3] While Defendant raises a *Daubert* challenge to exclude the proposed testimony of Plaintiff's expert, John Di Liberto, ECF No. 30-1 at 31, the Court does not address this challenge at present as it is not "essential" to deciding the cross-motions for summary judgment. *See Spychalla v. Avco Corp.*, No. 11-00497, 2014 WL 6736251, at *1, n.1 (E.D. Pa. July 24, 2014); *see also Weinlein v. Anapa Shipping Ltd.*, No. 12-4625, 2015 WL 760712, at *6 (D.N.J. Feb. 20, 2015) (not considering *Daubert* challenge at summary judgment stage where the proposed expert report would not have impacted the court's decision). Specifically, Defendant argues that Di Liberto's proposed testimony regarding its "claim handling" must be excluded because his opinions are "unsupported by the record and do not constitute reliable expert opinion." ECF No. 30-1 at 37. However, given that the disposition of the *Daubert* issues here do not impact this Court's decision on summary judgment, these "*Daubert* issues . . . are more properly addressed [at] . . . trial." *Avco Corp.*, 2014 WL 6736251, at *1, n.1.